## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**STANLEY RUSSELL VANDUZER, JR.,**

     **Plaintiff,**

**v.**                                 **Case No. 2:14-cv-17230**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration,**

     **Defendant.**

### MEMORANDUM OPINION

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The case is presently before the Court on the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 11, 12). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 7, 8). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court **FINDS** that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I.   Procedural History

Plaintiff, Stanley Russell Vanduzer, Jr., ("Claimant"), filed for DIB and SSI on June 13, 2007, alleging a disability onset date of July 10, 2006, (Tr. at 369, 372), due to

"lost vision right eye, hearing problems, back condition, severe headaches." (Tr. at 410). The Social Security Administration ("SSA") denied the applications initially and upon reconsideration. (Tr. at 142). Claimant filed a request for a hearing, which was held on February 26, 2010 and continued on June 23, 2010 before the Honorable Charlie Paul Andrus, Administrative Law Judge ("ALJ"). (Tr. at 52-72). By written decision dated July 6, 2010, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 142-52). Claimant filed a request for review, and the Appeals Council remanded the case to the ALJ for further proceedings. (Tr. at 159-61). On November 10, 2011, the ALJ conducted another hearing to address the issues raised by the Appeals Council. (Tr. at 73-91). By written decision dated January 20, 2012, the ALJ again found that Claimant was not disabled. (Tr. at 166-79). Claimant filed a request for review, and the Appeals Council remanded the case for a second time. (Tr. at 188-90).

On October 15, 2013, an administrative hearing was held before the Honorable Jack Penca, ALJ. (Tr. at 92-134). By written decision dated November 7, 2013, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 10-28). The ALJ's decision became the final decision of the Commissioner on March 27, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3). On May 30, 2014, Claimant timely filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the proceedings on August 8, 2014. (ECF Nos. 9, 10). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 11, 12). Accordingly, this matter is fully briefed and ready for resolution.

## II.   **Claimant's Background**

Claimant was 46 years old at the time of his alleged onset of disability and 53

years old on the date of the Commissioner's final decision. (Tr. at 96). He left school in the ninth grade and never obtained a General Equivalency Diploma ("GED"). (*Id.*). Claimant communicates in English and has prior relevant work experience as a truck driver. (Tr. at 409, 471).

### III.   <u>Summary of ALJ's Findings</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). First, the ALJ determines whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). Second, if the claimant is not gainfully employed, then the inquiry is whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). Third, if the claimant suffers from a severe impairment, the ALJ determines whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does meet or equal a listed impairment, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the

adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). In the fourth step, the ALJ ascertains whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability and the burden shifts to the Commissioner to prove the final step. *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). Under the fifth and final inquiry, the Commissioner must demonstrate that the claimant is able to perform other forms of substantial gainful activity, while taking into account the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the ALJ "must follow a special technique" when assessing disability. 20 C.F.R. §§ 404.1520a, 416.920a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If such impairment exists, the ALJ documents the findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the Regulations. *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's

impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the degree of functional limitation against the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment that neither meets nor equals a listed mental disorder, then the ALJ assesses the claimant's residual function. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3).

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status requirements of the Social Security Act through September 30, 2013. (Tr. at 12, Finding No. 1). The ALJ acknowledged that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since July 10, 2006, the alleged disability onset date. (Tr. at 13, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of "degenerative disc disease; major depressive disorder; generalized anxiety disorder; and pain disorder." (Tr. at 13-15, Finding No. 3). However, the ALJ found that Claimant's impairments of vision loss, hearing loss, hypertension, carpal tunnel syndrome, and various contusions were all nonsevere. (Tr. at 14-15). Under the third inquiry, the ALJ concluded that Claimant's impairments, either individually or in combination, failed to meet or

medically equal any of the listed impairments. (Tr. at 15-18, Finding No. 4). Consequently, the ALJ determined that Claimant had the RFC to:

> [P]erform light work as defined 20 C.F.R. 404.1567(b)  and 416.967(b) except that claimant can frequently reach overhead, frequency [sic] climb ramps and stairs, can occasionally climb ladders, ropes and scaffolds, and can occasionally balance, stoop, kneel, crouch or crawl. He must avoid concentrated exposure to cold, vibrations, hazards such as moving machinery and unprotected heights, and must avoid all exposure to loud noise. The claimant can perform simple repetitive routine tasks with no fast pace or strict production requirements, with occasional decision-making, in a stable work environment with few if any changes, and with occasional interactions with coworkers and the public.

(Tr. at 18-26, Finding No. 5). Based upon the RFC assessment, the ALJ determined at the fourth step that Claimant was unable to perform his past relevant work. (Tr. at 26, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine if he would be able to engage in substantial gainful activity. (Tr. at 26-28, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1960 and was defined as a younger individual on the alleged disability onset date, but had changed age category in the interim to closely approaching advanced age; (2) he had limited education and could communicate in English; and (3) transferability of job skills was not material to the disability determination. (Tr. at 26-27, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy; including, for example, work as a cleaner, deliveryman, or price marker. (Tr. at 27-28, Finding No. 10). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act at any time from July 10, 2006 through November 7, 2013, the date of the decision. (*Id.*, Finding No. 11).

**IV.**   **Claimant's Challenge to the Commissioner's Decision**

Claimant alleges that the Commissioner's decision is not supported by substantial evidence for two reasons: (1) the ALJ used improper criteria in evaluating Claimant's credibility; and (2) the ALJ failed to adequately account for all of Claimant's limitations in the RFC finding. (ECF No. 11). Claimant contends that while the evidence supports a fully favorable decision, at the very least, the ALJ should have awarded Claimant benefits for the closed period beginning on July 10, 2006 and terminating in April, 2013, when Claimant had back surgery. According to Claimant, during this time frame, he suffered from disabling back pain and related limitations that did not improve until he received surgical intervention.

**V.**   **Relevant Medical Records**

The Court has reviewed the transcript of proceedings in its entirety including the medical records in evidence. The Court has confined its summary of Claimant's treatment and evaluations to those entries most relevant to the issues in dispute.

**A. Treatment Records**

On October 14, 2002, Claimant went to the Emergency Department ("ED") at Seven Rivers Community Hospital complaining of pain in his right eye. He reported that he been struck in the eye with a wrench eight days earlier. (Tr. at 512-17). Claimant's vision was tested and reflected 20/70 acuity in the left eye; however, he was unable to perform the test for his right eye, stating that the vision in that eye was "cloudy." (Tr. at 512). The ED nurse examined Claimant's eyes and documented that his pupils were unequal with the right pupil being larger than the left. (Tr. at 513). The ED physician noted that Claimant's eye was red, and he had blurred vision and vision loss. (Tr. at 514). Accordingly, the ED physician contacted an ophthalmologist, Dr. Montgomery,

who agreed to further evaluate Claimant. (Tr. at 516-17). No further records pertaining to this injury were included in the Transcript of Proceedings.

On September 6, 2006, Claimant was examined by Dr. Edward Demmi, M.D. (Tr. at 546-48). Dr. Demmi documented that Claimant was a new consult who had been involved in a truck accident two months earlier. Claimant explained that a dump truck pulled out in front of him when he was driving a tractor-trailer, causing a front-end collision. Claimant reported that he was travelling approximately 47 miles per hour at the time of the crash. (Tr. at 546). He was wearing his seatbelt, but his stuck the windshield, knocking him unconscious for a brief period of time. Claimant complained that he continued to have headaches that were localized to the part of his head that struck the windshield. He also experienced lower back pain just above the tailbone, right knee pain, and a swollen right middle MCP joint. (*Id.*). Claimant stated that he was not taking any medications at the time.

Dr. Demmi performed a physical examination. (Tr. at 547). He found Claimant's visual acuity to be 20/200 in the right eye and 20/70 in the left eye with 20/70 vision bilaterally. Claimant's neck had a full range of motion, but he had tenderness at the L4-L5 vertebrae, facet tenderness, and an antalgic gait. A straight leg-raising test was negative. Claimant's right hand revealed swelling of the right middle MCP joint, although his grip was equal bilaterally and his neurovascular function was normal. Dr. Demmi ordered x-rays of the right knee, right hand, and lumbosacral spine and compared them to earlier ones taken at Seven Rivers Community Hospital. All were negative except for a finding of grade I to II spondylolisthesis[1] at L4-L5. (Tr. at 548). Dr.

---

[1] Spondylolisthesis is a forward displacement of a vertebra over a lower segment. Dorland's Medical Dictionary for Health Consumers. © 2007 by Saunders, an imprint of Elsevier, Inc.

Demmi diagnosed Claimant with concussion, visual field deficit, spondylolisthesis at L4-L5, contused right knee, and contusion of the right hand with reactive tenosynovitis at the middle MCP joint. Claimant was given high-dose ibuprofen and Flexeril. He was placed on restricted duty, including no driving, squatting, kneeling, crawling, no vibratory equipment, and no lifting, pulling or pushing greater than 15 pounds. (*Id.*). Dr. Demmi referred Claimant to an ophthalmologist to rule out a detached retina and to a physical therapist for treatment of his lumbosacral spine and right knee.

Claimant returned to Dr. Demmi's office for follow-up on September 19, 2006 and saw Stuart Barnes, a certified physician's assistant. (Tr. at 544). Claimant reported that physical therapy was helping, and he had no new symptoms. Claimant also mentioned that his ophthalmology appointment was scheduled for that afternoon. On examination, Claimant had some lumbar tenderness, but a straight leg-raising test was normal, and his gait was also observed to be normal. Claimant's Flexeril prescription was refilled. (*Id.*).

Claimant presented to St. Luke's Cataract & Laser Institute on September 19, 2006. (Tr. at 521-23). He reported having been in an accident two months earlier in which his forehead hit the windshield. Since that time, Claimant felt there was something in the center of his right eye that he was unable to see through. He also complained of blurriness in the eye and of experiencing headaches when he read. (Tr. at 521). After examining Claimant's eyes, the attending ophthalmologist diagnosed Claimant with traumatic macular edema caused by trauma that had resolved but left atrophic scarring in the right eye. However, both retinas were attached. (Tr. at 522). Claimant was told not to drive without glasses, but no treatment was rendered at that visit. (Tr. at 521).

On October 3, 2006, Claimant saw Dr. Demmi in follow-up. (Tr. at 542). He described his primary complaints as pain in the right knee and low back, and vision loss. An examination revealed tenderness in the lumbar area, but Claimant's right knee had a full range of motion. Claimant was restricted from driving, squatting, climbing, bending, and no lifting, pulling or pushing greater than 15 pounds. (*Id.*). These restrictions remained in place after Claimant's next visit with Stuart Barnes on October 24, 2006. (Tr. at 541).

On November 22, 2006, Claimant saw Dr. Samer Choski, a physician working with Dr. Demmi. (Tr. at 539-40). Claimant reported improvement in his right knee, but complained that he still had pain and tenderness in the lumbar spine. He advised that he had been recently bitten by a spider, which caused an infection and forced him to cancel his last two physical therapy sessions. He stated that his back pain generally decreased with physical therapy. On examination, Claimant had a negative straight leg-raising test and was able to squat fully and rise from that position without difficulty. Claimant was given Flexeril and advised to continue with the job restrictions imposed by Dr. Demmi. (*Id.*).

On December 15, 2006, Claimant underwent a MRI scan of his lumbar spine to investigate low back pain with a possible herniated disc. (Tr. at 524). The imaging showed osteoarthritic changes involving the spine with anterior spondylolisthesis of L4 in relation to L5; and severe bilateral foraminal narrowing at L4-L5, with hypertrophy and annular disc bulging. There was no evidence of spinal canal compromise. (*Id.*).

Claimant saw Stuart Barnes, PA-C, on December 20, 2006. (Tr. at 533-34). He reported a decrease in his post-accident headaches, a resolution of his knee pain, and improvement in his lumbar pain. Mr. Barnes noted the results of the MRI. After an

examination, Mr. Barnes diagnosed Claimant with low back pain, right knee contusion, blunt eye trauma, and closed head injury. He indicated that Claimant's back pain had a degenerative component, and his symptomatology was responding well to a cortisone injection. Claimant was instructed not to drive for the company and to limit lifting, pulling, and pushing to no more than 30 pounds. (*Id.*). By January 2, 2007, when Claimant presented to Dr. Demmi in follow-up, his lumbar and knee complaints had resolved. (Tr. at 532). However, Claimant was diagnosed with a permanent injury to his right eye and was told not to drive for the company. Dr. Demmi did not believe any further treatment was needed at the time. (*Id.*).

On June 14, 2007, Claimant returned to Dr. Demmi's office and saw Dr. Choski. (Tr. at 530-31). Claimant indicated that his back pain was worsening, and he needed a referral to pain management. Dr. Choski noted that the office records showed a resolution of Claimant's back pain in January 2007, with no treatment since that time. Nonetheless, Claimant insisted that his back pain had never completely disappeared. Dr. Choski decided to contact a colleague to discuss Claimant's case, and advised Claimant to wait in the examining room while the doctor made the call. However, when Dr. Choski returned to the room, he discovered that Claimant had left unexpectedly. (*Id.*).

On August 28, 2007, Claimant was seen at St. Luke's Cataract & Laser Institute. (Tr. at 518-20). On the intake form, Claimant stated that his vision had changed since his last appointment and was affecting his job. (Tr. at 519). Claimant also advised that he had hearing loss and a herniated disk. When asked about his ability to function, Claimant mentioned problems with traveling; seeing faces and the television from a distance; seeing the dials on the stove; and seeing colors and written materials even when close. (Tr. at 519). Claimant described having light sensitivity, but also stated that

his vision was worse when the lights were dim.

On visual examination, Claimant was found to have impaired vision in both eyes, with visual field constriction. (Tr. at 518). Claimant was instructed not to drive in view of his visual field limitations. He was scheduled for a Goldmann Visual Fields Study of both eyes, and was told to return in three weeks for a follow-up evaluation. (*Id.*).

On December 15, 2007, Claimant was referred for evaluation  and treatment to Dr. Robert Ulseth at Comprehensive Pain Management by Workers' Compensation. (Tr. at 572-77). Originally, Dr. Ulseth was scheduled to examine Claimant on December 4, 2007, but postponed the evaluation two weeks when Claimant appeared with "about a ream of paper" for the doctor to review. (Tr. at 578). On December 15, Claimant provided the history regarding his truck accident. (Tr. at 572). In addition, Dr. Ulseth had reviewed Claimant's prior records and his films. Claimant advised Dr. Ulseth that he continued to have pain in the lumbar spine that radiated into his buttocks on the right side down to the lateral aspect of the leg, crossing over the thigh and occasionally going down to the medial aspect of the right calf. Claimant stated that the pain was always present and was exacerbated by sitting, walking, standing, lifting, and bending. (Tr. at 573). The pain woke him up at night. Claimant denied having any weakness in the limbs, or problems with his bowel and bladder function. (Tr. at 574). Claimant also reported problems with his hearing and vision. Claimant told Dr. Ulseth that his goal was to find relief for his pain, so that he could return to work and live a normal life. (Tr. at 575).

On examination, Dr. Ulseth confirmed that Claimant was "hard of hearing." (*Id.*). However, Claimant had excellent range of motion in the lower back and could bend down to touch the floor. He had some problems with flexion, twisting, and side-to-side

movement. Claimant had a positive right leg-raising test and some decreased strength in the right leg when compared to the left, although both leg muscles technically measured 5/5 bilaterally. (Tr. at 576). Claimant also had decreased sensation in the right calf with pinprick. However, he was able to ambulate freely without difficulty. Dr. Ulseth diagnosed Claimant with low back pain and suggestive radicular symptoms down the right leg. Dr. Ulseth prescribed Lorcet and a Medrol dosepak and told Claimant to remain off work. Dr. Ulseth discussed weight loss with Claimant and recommended that he continue with exercises at home but to be careful. (Tr. at 576-77). Dr. Ulseth suggested that Claimant might be a candidate for epidural injections in the future.

Dr. Ulseth saw Claimant again on January 15 and February 12, 2008. (Tr. at 579-81). At the January visit, Claimant reported that he had good days where he did not need any medication and bad days when he took more than directed. Nonetheless, Dr. Ulseth noted that Claimant had not used more medication than was prescribed for the period as a whole. (Tr. at 580). Claimant had good pain relief from Hydrocodone, but that medication reduced his energy level. Claimant had not returned to physical therapy due to pain. Dr. Ulseth encouraged Claimant to return in order to get some muscle strengthening and flexibility. He prescribed Cymbalta to help Claimant with obvious signs of depression. (Tr. at 581). At the February visit, Claimant complained of still having symptoms, so Dr. Ulseth refilled the prescription for Lortab and added Prozac instead of Cymbalta, which was more expensive. (Tr. at 579). He lectured Claimant on taking the "bull by the horns," losing weight and getting more active, so that he could reduce his dependence on pain medication. (*Id.*).

On August 5, 2009, Claimant saw Dr. James Magnussen for complaints related to loss of hearing. (Tr. at 654). Claimant reported decreased hearing in both ears that had

persisted for at least three years. He had no other symptoms and took no medications. On examination, Claimant was noted to be a thin male in no acute distress. After testing, Claimant was diagnosed with bilateral sensorineural hearing loss of a flat nature. Dr. Magnussen suggested hearing aids and recommended that Claimant contact the West Virginia Bureau of Vocational Rehabilitation to see if it could help with the expense. (*Id.*).

On February 12, 2010, Claimant was examined by Lonnie Lucas at ProEyes Optometry Associates. (Tr. at 650-51). He was found to have uncorrected visual acuity of 20/400 in both eyes, when measured separately and together. His visual fields were found to be full in all quadrants by computerized screening. Claimant was diagnosed with a macular scar in the right eye, myopia, astigmatism, and presbyopia. He was told to monitor his vision in the right eye and to report any changes, although his prospect for visual recovery in that eye was not good. A modification of his eyeglass prescription was also recommended. (*Id.*).

On April 23, 2012, Claimant presented to Roane General Health Clinic to follow-up and to establish primary care with Dr. Grant Parkins after an Emergency Department ("ED") visit triggered by a fall in the shower. (Tr. at 724-26). His wife told Dr. Parkins that Claimant had actually fallen in the yard first and then later in the shower. (Tr. at 725). He complained of back pain radiating into both legs, with stiffness. Claimant's examination revealed paraspinal lumbar tenderness and spasm, but a straight leg-raising test was negative bilaterally. (Tr. at 726). Dr. Parkins diagnosed Claimant with a back contusion and prescribed Flexeril, Tramadol, and one 325 mg aspirin to take once per day. He was also given samples of Lyrica, Celebrex, and Lidoderm and told to return in one month.

Claimant returned on May 14, 2012 with complaints of forgetfulness. (Tr. at 727-29). He reported that Lyrica and Celebrex improved his back pain, but his memory was not as good. (Tr. at 728). Claimant's examination was grossly normal. Dr. Parkins diagnosed Claimant with degenerative disc disease ("DDD") of the lumbar spine and depression. (Tr. at 729). He prescribed Cymbalta, Lyrica, and Celebrex. Claimant was instructed to return in one month. When Claimant returned on June 25, 2012, he reported "doing much better" and stated that he was now working at Walmart. (Tr. at 730-32).

Claimant saw Dr. Parkins again on September 27, 2012 for right knee pain; on October 25, 2012 for follow-up after an ED visit and knee pain; and on December 18, 2012 for follow-up. (Tr. at 733-42). He reported having more falls during this period and had consulted with Dr. Crow, a neurosurgeon, for surgical intervention. He stated that Dr. Crow scheduled the procedure, but it was delayed. (Tr. at 741). Dr. Parkins refilled Claimant's medications and told him to return as needed. Claimant returned to Dr. Parkins's office two more times before his back surgery for medication refills. (Tr. at 874-80).

On October 10, 2012, Claimant underwent an MRI scan of the lumbar spine. (Tr. at 722-23). The imaging showed advanced multilevel degenerative lumbar facet and disc disease. Canal stenosis was appreciated at the L2-L3 and moderate central canal and left neural foraminal stenosis at L3-L4. (Tr. at 723). Severe neural foraminal narrowing was present on the left with moderate neural foraminal narrowing on the right. At the L4-L5, there was severe bilateral foraminal stenosis and grade 2 anterolisthesis, with an asymmetrical disc bulge at L5-S1, causing impingement of the foraminal and extraforaminal portions of the left L5 nerve root. (*Id.*).

Claimant was seen by Dr. Crow on November 5, 2012. (Tr. at 770-74). Claimant reported chronic back pain exacerbated by a fall in the shower six months earlier. He stated that conservative therapy worked at the time to lessen his symptoms. However, approximately one month ago, Claimant suffered another fall when he stepped off the back of a pick-up truck. At that time, he felt pain and weakness in the lower extremities. (Tr. at 771). He also developed numbness radiating down both legs and some difficulties with urination. Dr. Crow conducted a neurological examination, which revealed an awkward gait. (Tr. at 773). Claimant used a walker to ambulate and could not walk on his heels or his toes. There was no midline percussible pain, however, and straight leg-raising tests were negative. Claimant had decreased strength and sensation in the lower extremities. Dr. Crow diagnosed an exacerbation of Claimant's pre-existing back problems and recommended a multilevel decompression and pedicle fixation. (Tr. at 774). Claimant wanted to avoid surgery, so physical therapy was arranged.

Claimant returned to Dr. Crow's office on February 1 and 8, 2013. (Tr. at 775-81). Both times, he was seen by Dr. Lana Christiano. Claimant continued to complain of chronic back pain and weakness. His strength testing confirmed some decreased strength of both lower extremities, but muscle tone and movement was normal. (Tr. at 779). After completing her examinations and reviewing films, Dr. Christiano recommended that Claimant undergo a fusion at the L4-L5 with interbody graft, a L2-L3 lumbar laminectomy to allow central decompression, and a pedicle fusion from L2 to L5. (Tr. at 780). Claimant agreed and underwent surgery on April 4, 2013. (Tr. at 828-30). The procedures included a L4-L5 lumbar interbody fusion, L4-L5 pedicle screws, L4-L5 laminectomy with facetectomy, and a L2 laminectomy. Postoperatively, Claimant did well, reporting complete relief of the back and leg pain. (Tr. at 824).

In October 2013, Dr. Christiano recommended, and Claimant underwent, nerve conduction studies for numbness and tingling in his upper extremities. (Tr. at 883-84). The studies reflected evidence of bilateral carpal tunnel syndrome of moderate degree. (*Id.*).

## B. Agency Evaluations and RFC Opinions

On May 18, 2007, Dr. Amy Clunn performed an independent medical examination of Claimant. (Tr. at 526-29). She documented Claimant's history of low back injury occurring on July 10, 2006 when his tractor-trailer was involved in a front-end impact. Claimant indicated that his head hit the windshield, his right knee hit the inside of the vehicle, and his chair snapped back, causing his to experience pain in the back. (Tr. at 526). Claimant reported having chronic headaches, low back pain radiating down his right lower extremity to the knee, and a detached retina of the right eye. Claimant stated that his knee pain had improved with physical therapy, but he still experienced considerable low back pain. He rated the severity of the pain as 8.5 on a 10-point scale, describing it as sharp, stabbing, and continuous. Claimant indicated that standing, walking, driving, lifting, bending, and twisting exacerbated the pain, while lying down and applying heat reduced it. (*Id.*). He had numbness, weakness, and nocturnal pain, but no problems with bladder or bowel function. Claimant reported that he had tried physical therapy, but it did not help his back. He had not received injections, nor seen a surgeon. (Tr. at 527).

Dr. Clunn performed a neuromusculoskeletal examination, noting that Claimant walked without assistive devices. (Tr. at 528). His cervical and thoracic spinal range of motion was normal; however, he showed reduced lumbar lordosis and segmental mobility. He had paravertebral spasms. Claimant's hip and knee range of motion were

normal, and his extremity strength was equal bilaterally at 5/5. (*Id.*).Claimant was able to toe and heel walk, indicating functional distal strength. Claimant had a negative seated straight leg-raising test and normal neurological findings. Dr. Clunn diagnosed Claimant with a lumbosacral sprain, and with spondylolisthesis, severe facet hypertrophy, foraminal narrowing, and herniated disk at L4-5 on MRI. She opined that Claimant had not reached maximum medical improvement and should be offered a trial of epidural steroid injections, physical therapy, and medication, as necessary. At this time, she recommended no lifting greater than twenty pounds and no repetitive bending. She believed Claimant would ultimately have permanent restrictions and might need a fusion surgery if the conservative therapy did not work. (Tr. at 529).

On October 18, 2007, after several visits with Claimant, Dr. Michael Webb completed a Workers' Compensation Uniform Medical Treatment/Status Reporting Form. (Tr. at 612). Dr. Webb indicated that Claimant needed pain management services and physical /occupational therapy. He opined that on January 2, 2007, Claimant had reached his maximum medical improvement from the work-related accident. (Tr. at 613). Dr. Webb felt Claimant should be restricted from lifting more than 20 pounds and should not be permitted to do any commercial driving. (*Id.*).

Also on October 18, 2007, Claimant was sent by Disability Determination Services ("DDS") to L. Earl Wingo, M.D. for an eye examination. (Tr. at 552-58). Without correction, Claimant had visual acuity of 20/800 in his right eye and 20/150 in his left eye. (Tr. at 558). With best correction, Claimant still had visual acuity of 20/800 in the right eye and 20/25 in the left eye. Dr. Wingo noted that Claimant had no central vision in his right eye, but did have peripheral vision. (*Id.*).

Dr. Eric Puestow completed a Physical Residual Functional Capacity Assessment

form on October 24, 2007. (Tr. at 559-66). He opined that Claimant could frequently lift and carry 25 pounds; occasionally lift and carry 50 pounds; stand and/or walk 6 hours in an 8-hour work day; sit about 6 hours in an 8-hour work day; and had an unlimited ability to push and pull. (Tr. at 560). Dr. Puestow did not believe Claimant had any postural, manipulative, or communicative limitations, but assessed Claimant as limited in depth perception. (Tr. at 561-62). He recommended that Claimant avoid concentrated exposure to noise and hazards, such as machinery and heights. (Tr. at 563). Dr. Puestow commented that Claimant had credible allegations of loss of hearing and right eye vision; therefore, hearing conservation and hazard restrictions were in order. (Tr. at 564).

On March 10, 2008, Stephen Burge, M.D., completed a Physical Residual Functional Capacity Assessment form. (Tr. at 583-90). He opined that Claimant could frequently lift and carry 25 pounds; occasionally lift and carry 50 pounds; stand and/or walk 6 hours in an 8-hour work day; sit about 6 hours in an 8-hour work day; and had an unlimited ability to push and pull. (Tr. at 584). Dr. Burge did not believe Claimant had any postural, manipulative, or communicative limitations, but assessed Claimant as limited in depth perception and field of vision. (Tr. at 585-86). He commented that Claimant additionally had decreased vision and hearing, but his ability to hear could be corrected with hearing aids. (Tr. at 584). Dr. Burge was not particularly impressed with Claimant's spinal problems. (*Id.*). He recommended that Claimant avoid concentrated exposure to noise. (Tr. at 587).

On March 26, 2008, Claimant was referred by DDS to Collen Character, Ph.D., for a psychological evaluation. (Tr. at 591-94). Dr. Character interviewed Claimant to obtain his history. Claimant stated that he had a good childhood, having been raised

with four sisters on a dairy farm in New York. He denied any family history of psychiatric problems, and he had no serious problems with alcohol, drugs, or the law. (Tr. at 591). Claimant indicated that he left school in the ninth grade so that he could start working. He was never in the military. Claimant admitted to two marriages. The first marriage lasted approximately twenty years and resulted in five children. He had been in his second marriage for two years. (Tr. at 592). Claimant stated that he last worked in July 2006, when he was involved in an accident and was terminated from his position as a semi-truck driver. Claimant denied any inpatient or outpatient psychiatric care, but reported a two and one half year history of taking psychotropic medications for depression and pain. He claimed to still have depression related to his lack of employment and precarious financial situation.

When asked about his current living situation and activities, Claimant indicated that he lived in a house with his wife. He liked to go horseback riding, fishing, hunting, bowling, and liked to ride motorcycles. (Tr. at 592). He could complete his activities of daily living independently and helped his wife do the shopping However, Claimant's wife did the cooking, laundry, housework, and yard work. (Tr. at 593).

Dr. Character documented her observations of Claimant, noting that he was prompt for his appointment, and was dressed and groomed properly. He reportedly wore glasses and hearing aids, and he did not evidence problems with speech. His eye contact and affect were appropriate. Claimant was oriented in all spheres; he had average abstract thinking, normal thought content, average judgment, but a lack of common sense. Dr. Character diagnosed Claimant with major depression, mild; anxiety disorder, not otherwise specified ("NOS"); and pain disorder associated with both psychological factors and a general medical condition. (Tr. at 594).

On April 29 and 30, 2008, Edmund Bartlett, Ph.D., completed a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique. (Tr. at 621-38). Dr. Bartlett opined that Claimant had an affective disorder (major depressive disorder), anxiety-related disorder (pain disorder), somatoform disorder (multiple somatic complaints), and substance addiction disorder (polysubstance abuse for alcohol and marijuana, currently in remission). (Tr. at 625, 628, 630-31, 633). He felt Claimant had mild limitations in activities of daily living and moderate limitations in maintaining social functioning and persistence, concentration, or pace. He had no episodes of decompensation. (Tr. at 635). Claimant showed no evidence of paragraph C criteria. (Tr. at 636). Overall, Dr. Bartlett believed Claimant's mental health impairment was moderate. (Tr. at 637). With respect to specific work-related functions, Dr. Bartlett opined that Claimant was moderately limited in his ability to maintain attention and concentration for extended periods of time, regularly attend work, be punctual, complete tasks on schedule, and not have psychologically-based interruptions and extended rest periods during a regular work day. (Tr. at 621-22). In summary, Dr. Bartlett opined that Claimant was "still capable of doing simple and basic tasks and low stress settings of home or work." (Tr. at 623).

On March 23, 2010, Claimant was examined by Penny Perdue, M.A., at Associates in Psychology and Therapy, Inc., for DDS. (Tr. at 656-59). Claimant reported that he was in chronic pain, and his pain influenced his mood. He described feeling depression, sadness, loss of energy, social withdrawal, irritability, nervousness, and worry. Claimant stated that his pain affected his sleep, and he also had situational panic attacks. (Tr. at 656). He denied receiving counseling or having inpatient psychiatric care. Claimant reported completing the eighth grade, and he never attempted to obtain a

General Equivalency Diploma ('GED"). However, Claimant denied being in special education classes or having discipline problems. (Tr. at 657). Ms. Perdue reviewed Claimant's records and conducted a mental status examination. She found Claimant to have fair grooming and hygiene, noting that he wore dark glasses and had long hair. His interaction was appropriate. He was cooperative and had relevant and coherent speech; a normal affect; normal orientation; normal thought content and processes, judgment and insight; and no delusions or hallucinations. Claimant's immediate and remote memory was normal, but his recent memory appeared moderately deficient. Claimant's concentration was mildly deficient, and he exhibited pain behaviors during the examination. (Tr. at 657-58).

Ms. Perdue administered a series of tests. Claimant was unable to complete the Wechsler Adult Intelligence Test due to eyesight problems, but scored at the 11.7 grade level in reading, 6.8 level in spelling, and 5.2 level in math on the Wide Range Achievement Test. Ms. Perdue diagnosed Claimant with depressive disorder, NOS, and anxiety disorder, NOS. (Tr. at 658). She felt his prognosis was poor in light of his chronic pain. (Tr. at 659). Ms. Perdue documented Claimant's daily activities as watching television, lying in bed, cooking once per week, vacuuming, maintaining his grooming and hygiene, driving occasionally, woodworking, reading, and hunting. Claimant stated that many of his activities, such as reading, shopping, and shaving, were significantly limited due to his poor eyesight. Ms. Perdue felt Claimant had normal social functioning, although he complained that his social interaction was nonexistent due to his hearing loss. She found his persistence and pace to be normal. (Tr. at 659).

Ms. Perdue completed a Medical Source Statement of Ability to do Work-Related Activities (Mental). (Tr. at 660). She opined that Claimant was mildly limited in his

ability to make judgments on simple work-related decisions; was moderately limited in his ability to understand and remember complex instructions; and was moderately to markedly limited in carrying out complex instructions and making complex work-related decisions. Ms. Perdue explained that most of Claimant's limitations were related to physical problems and pain, and his abilities would fluctuate depending upon his level of discomfort. (*Id.*). In functions related to social interaction, Ms. Perdue opined that Claimant was mildly to moderately impaired, again largely dependent upon his pain level. (Tr. at 661).

On May 12, 2010, Dr. Kip Beard performed a physical evaluation of Claimant for DDS. (Tr. at 664-69). He documented Claimant's chief complaints to be loss of vision in the right eye, loss of hearing, back condition, and severe headaches. Claimant described his symptoms, reporting that his headaches occurred every day, at least twice per day, and lasted two hours to all day. The pain was a seven on a ten-point scale and was a stabbing pain that started behind his right eye, radiating to the right forehead and back of the head. (Tr. at 665). His back pain was constant, affecting his right side more than his left. He indicated that he pain limited his ability to walk, climb steps, and lift. Claimant took Crestor, Cymbalta, Nexium, and ibuprofen for his symptoms. (Tr. at 665).

Dr. Beard reviewed Claimant's old records and then performed an examination. (Tr. at 666-67). He noted that Claimant walked with a right-sided limp, but had a gait that was "not unsteady." With corrective lenses, Claimant's visual acuity was 20/200 in the right eye and 20/40 in the left when corrected. Claimant's extremities, cervical spine, hands, knees, ankles, and feet were all normal with good range of motion. (Tr. at 667). Claimant complained of pain in the lumbosacral spine, but curvature and range of motion were normal. Claimant could stand on one leg, had no leg length discrepancy, a

- 23 -

negative seated straight leg-raising test, and no spasms. Claimant's neurological testing was normal, including calf, thigh bicep and forearm measurements. (Tr. at 668). Dr. Beard diagnosed Claimant with a right eye macular scar with decreased vision, bilateral sensorineural hearing loss, chronic lumbosacral strain with right symptoms and report of bulging disk, and headaches. (*Id.*).

Dr. Beard completed a Medical Source Statement of Ability to do Work-Related Activities (Physical). (Tr. at 670-76). He opined that Claimant could continuously lift and carry 10 pounds, frequently lift and carry up to 20 pounds; occasionally lift and carry up to 100 pounds; stand and walk 2 hours each in an 8-hour work day; and sit about 4 hours in an 8-hour work day, although he could only stand and walk one hour at a time, and sit up to 2 hours without interruption. (Tr. at 671). Dr. Beard added that Claimant had some limitations in reaching, pushing, pulling, and handling floor controls. He also felt that Claimant was limited to only occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ladders and scaffolds. (Tr. at 673). Finally, he opined that Claimant should never be around unprotected heights. (Tr. at 674).

Claimant received a second physical evaluation for DDS on July 6, 2011, which was performed by Stephen Nutter, M.D. (Tr. at 688-91). Claimant continued to complain of back pain and headaches related to his 2006 accident. His description of the pain and resulting limitations was consistent with his report to Dr. Beard. On examination, Claimant was observed to walk with a limping gait. His neck, hands, and cervical spine examinations were normal. (Tr. at 690). Claimant's shoulders were painful with movement and tender, and his right knee experienced mild pain with movement, as well as tenderness. Claimant had pain with range of motion testing of his

dorsolumbar spine, but no spasms. His straight leg-raising test was normal in both sitting and supine positions. (Tr. at 691). Neurological testing was normal, as were measurements of Claimant's upper arms, forearms, upper legs, and calves. Claimant could walk on his heels and toes, could tandem walk, and could squat without difficulty. Muscle strength was equal bilaterally at 5/5. (*Id.*). Dr. Nutter diagnosed Claimant with chronic lumbar strain and arthralgia.

Dr. Nutter also completed a Medical Source Statement of Ability to do Work-Related Activities (Physical). (Tr. at 692-98). He opined that Claimant could continuously lift and carry 10 pounds, frequently lift and carry up to 20 pounds; occasionally lift and carry up to 50 pounds; stand 4 hours, walk 3 hours, and sit 5 hours in an 8-hour work day, although he could only stand 3 hours, walk 2 hours, and sit 4 hours without interruption. (Tr. at 693). Dr. Nutter found that Claimant had some limitation in reaching overhead and felt that he was limited to only occasional balancing, stooping, crawling, and climbing of ladders and scaffolds. (Tr. at 695). Claimant could frequently climb stairs and ramps, kneel, and crawl. Finally, he opined that Claimant could only occasionally be around unprotected heights and tolerate vibrations. (Tr. at 696).

On July 11, 2011, Claimant saw Dr. John Wade at the request of the DDS. (Tr. at 699). Dr. Wade, an otolaryngologist, was asked to assess Claimant's hearing loss. After taking a history and performing an examination, Dr. Wade diagnosed Claimant with nasal obstruction, cephalgia, hearing loss, and tinnitus. He felt that Claimant's hearing loss was bilateral and moderately severe with a possible nonorganic overlay. He noted that Claimant was hesitant to respond and provided inconsistent responses when tested.

Another eye examination was performed on Claimant on July 28, 2011. (Tr. at

701-03). John Wiles, OD, diagnosed Claimant with a macular injury to the right eye with central and some temporal loss of vision. He measured Claimant's visual acuity as 20/100 in the right eye with best correction, near, and 20/20 in the left eye. (Tr. at 701). Visual acuity, distant, was 20/200 in the right eye and 20/20 in the left eye, with best correction.

On August 27, 2011, Claimant was assessed by Dr. Paul Craig, an occupational medicine specialist, at the request of Claimant's attorney. (Tr. at 712-13). Dr. Craig summarized his examination by noting that Claimant had no frank radicular deficits, but did reflect findings suggestive of spondylolisthesis at the L4-L5. Claimant had no upper extremity radicular symptoms to explain his headaches, and the headaches sounded almost migrainous by description. Claimant did have symptoms of bilateral carpal tunnel syndrome. He also likely suffered a retinal tear at the time of his truck accident, which caused gradual decrease of vision to the point that Claimant was essentially monocular. Dr. Craig indicated that Claimant might have hearing loss, but found the records to be inconsistent. Dr. Craig opined that Claimant's impairments, in combination, rendered him unable to sustain regular 8-hour per day, 5 days per week employment at the present time. (Tr. at 713). Nevertheless, Dr. Craig felt that with intervention, motivation, and vocational rehabilitation assistance might be able to return to full time employment. The necessary intervention would include corrective lenses, hearing aids, and treatment of the musculoskeletal issues. However, without treatment and assistance, Claimant would remain disabled.

Dr. Craig completed a Medical Assessment of Ability to do Work-Related Activities (Physical). (Tr. at 714-16). He opined that Claimant could lift and carry up to 20 pounds occasionally and 10 pounds or less frequently. (Tr. at 714). Claimant could

stand no more than 6 hours per day and only 2-4 hours without interruption. (Tr. at 715). He could sit a maximum of 6 hours, but would need to change position every 2-4 hours. He could only rarely balance, stoop, crouch, and kneel, and should never climb or crawl. Dr. Craig indicated that Claimant was limited in reaching, handling, pushing, and pulling, and he had numerous environmental limitations involving his exposure to heights, machinery, temperature extremes, chemicals, fumes, humidity, and vibrations. (Tr. at 716).

On February 28, 2013, Claimant met with Kara Gettman-Hughes, M.A., for a psychological examination ordered by DDS. (Tr. at 782-87). Claimant arrived at the appointment in the company of his wife. He provided history consistent with prior accounts. He added that he had tried to return to work at Walmart, but had to quit due to his back. After that, it took him three weeks to regain his ability to walk. (Tr. at 783). He described his psychological symptoms as including sadness, guilt, depression, sleep impairment, helplessness, fatigue, excessive worry, frustration, muscle tension, difficulty concentrating, and memory impairment. For the first time, Claimant reported getting psychological treatment during childhood, but could provide no details. (Tr. at 784). He indicated that his current medications included Cymbalta, Hydrocodone, and Lyrica.

After reviewing Claimant's history and prior records, Ms. Gettman-Hughes performed a mental status examination. (Tr. at 785). She observed that Claimant was dressed properly for the evaluation and was cooperative. He was oriented in all spheres except he did not know the exact date. His mood was sad; his affect restricted; his judgment was intact; his speech was normal; and his insight was fair. Claimant's immediate and recent memory was impaired, and his remote memory was fair.

Concentration and pace were normal, but his persistence and social interactions were mildly impaired. Ms. Gettman-Hughes diagnosed Claimant with major depressive disorder, recurrent, moderate, without psychotic features; generalized anxiety disorder; and pain disorder associated with psychological factors and general medical condition. (*Id.*). She documented Claimant's self-reported social functioning as going to the store and doctors' appointment. (Tr. at 786). Claimant had three friends and ate out once per month, but did not talk on the telephone, visit his friends, go to movies, or go to the mall. His daily activities included normal grooming with some help showering, taking his grandson to school, washing the dishes, caring for the family's pigs, helping his grandson with homework, watching videos, and reading books. Claimant ate twice per day and bathed three times per week. Ms. Gettman-Hughes felt Claimant's prognosis was poor.

Ms. Gettman-Hughes completed a Medical Source Statement of Ability to do Work-Related Activities (Mental). (Tr. at 788-91). She opined that Claimant was mildly limited in his ability to understand, remember, and carry out simple instructions and make judgments on simple work-related decisions; was moderately limited in his ability to understand, remember, and carry out complex instructions, make complex work-related decisions. (Tr. at 788). In functions related to social interaction, Ms. Perdue opined that Claimant was moderately impaired in most functions, except he was markedly impaired in the ability to respond appropriately to the usual work situations and to changes in the work setting. (Tr. at 789).

On March 11, 2013, Claimant was examined by Dr. Rakesh Wahi for DDS. (Tr. at 796-99). Dr. Wahi remarked that Claimant's hearing impairment made it difficult to interview him. Claimant also complained of vision loss and back problems. Claimant

denied drinking alcohol, but admitted to smoking and drinking 36 cups of coffee per day. On physical examination, Claimant was oriented, fully cooperative, well-nourished and hydrated, and appeared his stated age of 52. (Tr. at 798). Claimant's visual acuity was 20/100 in the left eye, and unmeasurable in the right eye. Claimant had a noticeable limp, but was able to get on and off the examination table. He could walk on his heels and toes, but could not squat. (Tr. at 798-99). His upper and lower extremity strength was 5/5 bilaterally, without signs of atrophy or hypertrophy. (Tr. at 799). Claimant expressed considerable pain in the lumbar spine when examined. Dr. Wahi diagnosed Claimant with hearing loss, vision loss, and traumatic arthritis of the lumbar spine. He opined that Claimant had suffered severe trauma to his lumbar spine that caused pain and limited his daily activities. According to Dr. Wahi, Claimant showed significant range of motion limitations, and his complaints of pain were corroborated by his need for medications.

Dr. Wahi completed a Medical Source Statement of Ability to do Work-Related Activities (Physical). (Tr. at 800-05). He opined that Claimant could lift and carry up to 20 pounds continuously and 50 pounds or less occasionally. (Tr. at 800). Claimant could stand no more than 1 hour per day, sit a maximum of 6 hours, and walk 1 hour. (Tr. at 801) Dr. Wahi did not include the need for positional changes. He opined that Claimant could frequently reach, handle, finger, feel, and push/pull, but could never reach overhead with his right hand. (Tr. at 802). He could frequently operate foot controls with both feet. With respect to postural limitations, Dr. Wahi felt that Claimant should never balance, stoop, kneel, crouch, and crawl, but could occasionally climb stairs, ramps, ladders, and scaffolds. (Tr. at 803). He opined that even with the hearing loss, Claimant retained the ability to hear and understand oral instructions and

communicate using the telephone. Even with his visual loss, Claimant should be able to view a computer screen, determine differences in shape and color of small objects like nuts and bolts, and avoid hazards. However, Dr. Wahi did not believe Claimant could read print. *(Id.)*. Claimant had no environmental limitations and could tolerate loud noises. (Tr. at 804).

Claimant hearing loss and vision loss were reconfirmed with additional consultations. Dr. Michael Goins, an otolaryngologist diagnosed Claimant with subjective tinnitus and mixed conductive sensorineural hearing loss on March 6, 2013, (Tr. at 809-11), and John Casto, O.D., diagnosed Claimant with a loss of central vision in the right eye, with mildly constricted visual fields. His visual loss in the left eye could be corrected with lenses, and Dr. Casto suggested Claimant contact the Lions Club for financial assistance. (Tr. at 815).

## VI.   <u>**Scope of Review**</u>

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. The Fourth Circuit has defined substantial evidence as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the administrative law judge, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the

Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

The Court has considered Claimant's challenges and finds them unpersuasive. To the contrary, having analyzed the record as a whole, the Court concludes that the finding of the Commissioner that Claimant is not disabled is supported by substantial evidence.

**VII.   Analysis**

As previously stated, Claimant raises two challenges to the Commissioner's decision. First, Claimant contends that the ALJ used improper criteria in assessing his credibility. Second, Claimant alleges that the RFC finding did not fully account for all of his impairments; specifically, his marked limitation in adapting to changes in the work place and in responding to usual work situations, and his significant spinal pain and restrictions. Claimant argues that, at a minimum, the ALJ should have determined that Claimant qualified for a "closed period" of disability, or that he presumptively became disabled at age 50 under the Grids.

### A.  Claimant's Credibility

In this case, the ALJ found that Claimant was not fully credible in his statements regarding the intensity, persistence, and disabling effects of his impairments. Under Social Security regulations and rulings, the ALJ evaluates a claimant's report of

symptoms using a two-step method. 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, 1996 WL 374186 (S.S.A. 1996). First, the ALJ must decide whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. 20 C.F.R. §§ 404.1529(a), 416.929(a). In other words, a claimant's "statements about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating a claimant's credibility regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources, 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic

techniques, *id.* §§ 404.1529(c)(2), 416.929(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3); *see also Craig v. Chater*, 76 F.3d 585, 595 (4th Cir. 1996); SSA 96-7P, 1996 WL 374186, at *4-5. In *Hines v. Barnhart*, the Fourth Circuit Court of Appeals stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers.

453 F.3d 559, 565 n.3 (4th Cir. 2006) (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

Social Security Ruling 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, the Ruling explains that "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical

record demonstrating the claimant's attempt to seek treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." SSR 96-7p, 1996 WL 374186, at *4.

When considering whether an ALJ's credibility determination is supported by substantial evidence, the court's role is limited to scrutinizing the record to ascertain whether there is sufficient support for the ALJ's conclusion. 42 U.S.C. § 405(g) ("[T]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive ..."). Moreover, when reviewing the record, the court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 1996). Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). Indeed, the ALJ's credibility determination "should be accepted by the reviewing court absent exceptional circumstances." *Eldeco, Inc. v. NLRB,* 132 F.3d 1007, 1011 (4th Cir. 1997); *see also Bishop v. Com. of Soc. Sec.*, 583 F.App'x 65, 68 (4th Cir. 2014). "Exceptional circumstances include cases where a credibility determination is unreasonable, contradicts other findings of fact, or is based

on an inadequate reason or no reason at all." *Eldeco,* 132 F.3d at 1011.

Here, the ALJ provided multiple reasons for discounting Claimant's credibility. First, he explained that Claimant received largely conservative and routine treatment for his musculoskeletal symptoms. (Tr. at 19-20). In the period shortly after Claimant's truck accident, the treatment proved effective, culminating in a notation by Claimant's treating physician that Claimant's "lumbar complaints and knee complaints have resolved," and Claimant was seeking new employment. (*Id.*). The ALJ observed that Claimant did not obtain additional medical care for approximately six months, and when he did go to a physician in June 2007 for complaints of worsening back pain, Claimant inexplicably and unexpectedly left the physician's office while the physician was discussing Claimant's case with a colleague. (Tr. at 20). Six months later, Claimant sought treatment from a pain management specialist, Dr. Ulseth, who ordered medication and physical therapy, which again were conservative and routine measures. By February 2008, Claimant reported a decrease of pain symptoms with the medication and stated that physical therapy was also helping. (*Id.*). "[A]n unexplained inconsistency between the claimant's characterization of the severity of [his] condition and the treatment [he] sought to alleviate that condition is highly probative of the claimant's credibility." *Mickles v. Shalala,* 29 F.3d 918, 930 (4th Cir. 1994)

According to the ALJ, there was another gap in Claimant's treatment between 2008 and 2010. In January 2010, Claimant was told by a certified family nurse practitioner that he would need a pain clinic referral; however, Claimant failed to follow-up on the recommendation. The ALJ noted that Claimant received no significant treatment the remainder of 2010 or 2011, suggesting that his symptoms during this time frame were not as debilitating as he alleged. (*Id.*). Claimant argues that this statement

by the ALJ reflects "an unfair" conclusion and improper credibility assessment. Claimant points out that he told the ALJ that his treatment was limited due to his inability to pay the medical bills. However, Claimant's position is not entirely supported by the record; particularly, given his testimony at the administrative hearing that he received a medical card in 2010. (Tr. at 101). "A claimant's failure to obtain treatment can weigh against his credibility unless he has 'good reasons' for his failure or noncompliance." *Bin-Salamon v. Commissioner of Social Security*, No. 4:13–CV–00062, 2015 WL 302835, at *8 (Jan. 23. 2015) (citing *Mabe v. Colvin,* 4:12cv52, 2013 WL 6055239, at *7 (W.D.Va. Nov. 15, 2013). While lack of funds may be a good reason for not pursing expensive medical treatment, Claimant had the ability to pay for treatment beginning in 2010; accordingly, his reason does not fully explain the gaps in his treatment.

The ALJ further emphasized that during 2010 and 2011, Claimant underwent evaluations by agency consultants, Dr. Beard and Dr. Nutter, who did not observe any significant abnormalities when they examined Claimant. (Tr. at 20). Both physicians found Claimant to have equal muscle strength bilaterally, without evidence of atrophy, sensory deficits, or substantially decreased range of motion. Claimant had negative straight leg-raising tests and no frank evidence of radicular symptoms. When Claimant began to receive treatment in 2012 at the Roane General Hospital Clinic, he displayed lumbar tenderness and muscle spasms, but had negative straight leg-raising tests. Once more, Claimant was treated conservatively with medication, and he reported improvement in his symptoms. (Tr. at 21). The ALJ specifically referred to treatment notes prepared in June 2012 that documented Claimant's report of "doing well" and working at Walmart. (*Id.*). The ALJ acknowledged that Claimant exacerbated his lumbar

symptoms in October 2012 at work, but the resulting injury led to a spinal surgery in April 2013, which essentially eliminated Claimant's low back complaints. Consequently, the ALJ reasoned that when Claimant eventually developed genuinely debilitating symptoms, he underwent surgery to eradicate them.

The ALJ provides a similar review of Claimant' treatment and symptoms related to his mental impairments, stressing that Claimant's complaints did not correspond to treatment records or findings on mental status examinations. For example, although Claimant complained of disabling depression, he never received counseling or required inpatient treatment. At agency evaluations, Claimant was described as making good eye contact, wearing appropriate clothing, and having adequate hygiene. Although his mood was described by the examiners as sad or depressed, Claimant had normal thought processes and content, and even smiled and joked at one evaluation. (Tr. at 22). Claimant was given medication to relieve his depression, and he generally reported decreased symptoms with the medication.

Claimant contends that the ALJ improperly considered Claimant's failure to obtain eyeglasses and hearing aids as evidence that his complaints regarding loss of vision and loss of hearing were not credible. Claimant stresses that he did not purchase those aids because he did not have the money to do so, and his medical card did not cover those items. Accordingly, in Claimant's view, the ALJ erred by considering his failure to obtain eyeglasses and hearing aids as evidence of poor credibility. Claimant's criticism is unfounded. The ALJ found Claimant's lack of effort in pursuing hearing aids and glasses as evidence of a lack of credibility, because, despite his emphatically-stated desire to correct those deficits, Claimant never pursued recommended options for financial assistance. For example, a consulting examiner suggested that Claimant

contact the Lions Club to inquire about help with purchasing eyeglasses. (Tr. at 22). Similarly, another health care provider, Dr. James Magnussen, advised Claimant to contact the West Virginia Bureau of Vocational Rehabilitation to obtain financing for hearing aids. (Tr. at 654). Claimant apparently did neither. "[B]efore a claimant's failure to seek treatment can be ignored due to a financial hardship claim, 'all possible resources (*e.g.,* clinics, charitable and public assistance agencies, etc.), must be explored.'" *Smalls v. Commissioner of Social Sec.,* C/A No. 0:08-cv-211-GRA, 2009 WL 691931, at *7 n.7 (D.S.C. Mar. 12, 2009) (quoting SSR 82-59, 1975-1982 Soc.Sec.Rep.Serv. 793, 1982 WL 31384 (S.S.A. 1982); *see, also, Na-Tusch v. Colvin*, No. 1:13–CV–260–GCM–DCK, 2014 WL 4080087, at *7 (W.D.N.C. Jun. 27, 2014) (holding that a claimant must show that she tried to get treatment, but was denied due to a lack of funds in order "to avoid a negative credibility inference from a failure to pursue treatment.").

Claimant also argues that the ALJ erroneously considered Claimant's receipt of unemployment benefits as evidence adversely affecting his credibility. Claimant relies on SSA Memorandum 10-1258 (Aug. 9, 2010) for the proposition that the pursuit or receipt of unemployment benefits should not be given "inordinate weight" in assessing a claimant's credibility. Memorandum 10-1258 explicitly discusses whether the receipt of unemployment benefits precludes a finding of disability under the Social Security Act, and concludes that it does not. Nonetheless, the Memorandum makes clear that the receipt of unemployment benefits may be considered as one factor in determining whether a claimant is disabled. On the issue of credibility, an application for unemployment benefits is likewise a piece of significant evidence. As the ALJ in this case pointed out, to apply for unemployment benefits, a claimant must "certify that he

[is] physically and mentally able, willing, and available to work." (Tr. at 23). Such a certification contradicts Claimant's representation that his symptoms were so intense and persistent, he was unable to perform basic work-related functions. As such, it is a relevant piece of the credibility assessment. *See Baker v. Colvin*, 2015 WL 3562164, at *14 (D.S.C. Jun. 5, 2015) (citing *Black v. Apfel,* 143 F.3d 383 (8th Cir.1998) (stating that acceptance of unemployment benefits, which entails an assertion of the ability to work, is facially inconsistent with a claim for disability)); *Martin v. Colvin*, 2015 WL 1346990, at *4 (E.D.N.C. Mar. 24, 2015) ("Although the 'receipt of unemployment compensation does not in itself prove ability to work,' *Lackey v. Celebrezze,* 349 F.2d 76, 79 (4th Cir.1965), numerous courts within this circuit have held that the acceptance of unemployment benefits may weigh against an individual's credibility"); *and Bird v. Colvin*, 2015 WL 1062040, at *9 (D.Md. Mar. 10, 2015) (finding that consideration of unemployment benefits was proper in making a credibility finding).

Finally, Claimant complains that the ALJ acted in an inappropriate and prejudicial manner by using Claimant's embarrassment over his lack of education as evidence of poor credibility. The ALJ noted that Claimant had provided inconsistent evidence regarding the extent of his education, reporting in his application for benefits that he completed the twelfth grade, and later stating that he only completed the eighth grade and dropped out in the ninth grade. (Tr. at 22). According to the ALJ, Claimant's inconsistent statements "[place] his credibility at issue." (*Id.*). Certainly, one valid way to measure a claimant's credibility is to gauge the consistency of his statements as set forth in the record. Evidence demonstrating that a claimant is not entirely truthful or is incorrect about basic information he provided to his treating physicians, the SSA, or its consultants is one factor to be considered by the ALJ when assessing the reliability of

the claimant's statements regarding the severity of his symptoms. *See Stubblefield v. Astrue,* No. 4:09–CV–1072 (CEJ), 2010 WL 2696670, at *6-7 (E.D.Mo. Jul. 6, 2010) (holding that false or incorrect information given by a claimant about his employment and compliance with medication instructions was properly considered in the ALJ's credibility determination).

Here, the ALJ properly assessed Claimant's credibility using the two-step process required by applicable rulings and regulations. The ALJ considered Claimant's statements, objective medical findings, medical treatment, activities of daily living, financial issues, and the medical source statements. The ALJ resolved inconsistences in the evidence, relied on specific pieces of evidence, and weighed the medicals source statements. Moreover, the ALJ's written decision contained "specific reasons for the finding on credibility, supported by the evidence in the case record, and ... [was] sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *4.

Therefore, the Court finds that the ALJ followed proper agency procedures in assessing Claimant's credibility, and the ALJ's determination is supported by substantial evidence.

### B.  Claimant's RFC Finding

With respect to his RFC finding, Claimant argues that the ALJ erred when concluding that Claimant could perform jobs at the light exertional level. According to Claimant, the ALJ (1) failed to fully account for Claimant's mental impairments and his severe lumbar pain; (2) failed to fully incorporate the opinions of the consultative experts in the RFC finding; and (3) failed to consider awarding Claimant benefits for a

"closed period" to account for the years prior to Claimant's successful back surgery, during which he suffered from unrelenting lumbar pain and substantial restriction.

Residual functional capacity is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. 1996). RFC is a measurement of the **_most_** that a claimant can do despite his or her limitations and is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* Social Security Ruling 96-8p provides guidance on how an ALJ should determine a claimant's RFC. According to the Ruling, the ALJ's RFC analysis requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." *Id.* Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.*

at *7. A proper RFC assessment requires the ALJ to "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (e.g. 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the record." *Id.* Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p, 1996 WL 374184, at *7.

Moreover, in considering allegations of symptoms such as pain, the RFC assessment must 1) "contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate"; 2) "include a resolution of any inconsistencies in the evidence as a whole"; and 3) "set forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." *Id.* The ALJ must discuss "why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* Similarly, the ALJ "must always consider and address medical source opinions" in assessing the Claimant's RFC. *Id.* As with symptom allegations, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

A review of the ALJ's written decision demonstrates that he generally met the requirements of SSR 96-8p in evaluating Claimant's RFC. Indeed, the Claimant provides few specific criticisms of the ALJ's analysis. In fact, rather than an indictment of the process used by the ALJ, Claimant's challenge is primarily to the outcome of the analysis. Notwithstanding the absence of detailed criticisms, Claimant is exactly right to

focus on the ALJ's exertional finding. As Claimant points out, if he was limited to sedentary work, then he was entitled to a finding of disability to begin no later than his fiftieth birthday in 2010. In the alternative, Claimant contends that, at a minimum, he was entitled to a closed period of disability for the time between his truck accident and his surgical repair.[2] Claimant argues that the ALJ's RFC finding is not representative of Claimant's level of dysfunction during that time frame. For these reasons, the Court has closely examined the ALJ's finding that Claimant was capable of performing light level exertional work both before and after his successful back surgery in April 2013. In performing this review, the Court bears in mind that it is neither tasked, nor authorized, to conduct a *de novo* review of the record. To the contrary, the Court must uphold the Commissioner's decision if it is supported by substantial evidence, regardless of whether the Court agrees or disagrees with the decision. The burden on the ALJ to meet the "substantial evidence" bar is not particularly heavy given that substantial evidence is defined as more than a scintilla, but less than a preponderance, of the evidence of record. Applying this framework, the Court examines the ALJ's RFC finding.

The ALJ found that Claimant was capable of performing light level exertional work during the entire period from the alleged onset of disability in July 2006 through the date of the decision in November 2013. Light work is defined as:

> [L]ifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the

---

[2] Title 20 C.F.R. §§ 404.316, 404.1594, 416.994 provide that the SSA may award disability benefits on a continuing basis or for a finite period. "It is the policy of the Social Security Administration to establish a closed period of disability where evidence indicates that a claimant was disabled for a continuous period of twelve (12) months, even if the claimant is no longer disabled by the time a determination is made." *Pumphrey v. Commissioner of Social Sec.*, Civil Action No. 3:14–CV–712015 WL 3868354, at *30 (N.D.W.Va. Jun. 23, 2015) (quoting *Program Operations Manual System* ("POMS") DI § 25510.001).

> ability to do substantially all of these activities. If someone can do light
> work, we determine that he or she can also do sedentary work, unless
> there are additional limiting factors such as loss of fine dexterity or
> inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b). The ability to stand and walk required by this

exertional level is further clarified in SSR 83-10, which provides that light level jobs

often require frequent walking and standing—"the primary difference between

sedentary and most light jobs." SSR 83-10, 1983 WL 31251, at *5 (S.S.A. 1983).

According to SSR 83-10:

> "Frequent" means occurring from one-third to two-thirds of the time.
> Since frequent lifting or carrying requires being on one's feet up to two-
> thirds of a workday, the full range of light work requires standing or
> walking, off and on, for a total of approximately 6 hours of an 8-hour
> workday. Sitting may occur intermittently during the remaining time. The
> lifting requirement for the majority of light jobs can be accomplished with
> occasional, rather than frequent, stooping. Many unskilled light jobs are
> performed primarily in one location, with the ability to stand being more
> critical than the ability to walk. They require use of arms and hands to
> grasp and to hold and turn objects, and they generally do not require use
> of the fingers for fine activities to the extent required in much sedentary
> work.

*Id.,* at *6.  The ALJ addressed eight medical source statements that expressly evaluated

Claimant's exertional capabilities. He gave some weight to seven of the opinions and

significant weight to one opinion. (Tr. at 23-25). First, the ALJ discussed the restrictions

placed on Claimant by Dr. Demmi in September 2006, shortly after Claimant's truck

accident. The ALJ noted that by January 2007, Dr. Demmi had removed all exertional

restrictions, finding that Claimant's injuries had largely resolved. (Tr. at 23, 532). The

ALJ gave this opinion significant weight. Thus, even if Claimant was incapable of

performing light work immediately after his accident, the limitations did not exist for at

least twelve continuous months as required to make a finding of disability.

Next, the ALJ considered opinions by Dr. Amy Clunn, which were expressed in

May 2007 after she conducted an evaluation of Claimant for Workers' Compensation. (*Id.*). Dr. Clunn opined that Claimant had not reached maximum medical improvement and, for the time being, she recommended no lifting greater than twenty pounds and no repetitive bending. (Tr. at 529). Therefore, these opinions were not inconsistent with an RFC finding of light level exertional work. The ALJ gave this opinion "some" weight, but observed that subsequent opinions were "more telling of the claimant's functional limitations." (Tr. at 23).

The ALJ also reviewed an opinion expressed by Dr. Eric Puestow in October 2007. (*Id.*). Dr. Puestow found Claimant capable of occasionally lifting and carrying fifty pounds, frequently lifting and carrying twenty-five pounds, and sitting, walking, and standing six hours each in an eight-hour workday with unlimited ability to push and pull. (Tr. at 560). This evaluation plainly determined that Claimant was capable of doing more than light exertional work. The ALJ gave this opinion some weight, explaining that subsequent treatment records and opinions supported the conclusion that Claimant was more functionally limited than determined by Dr. Puestow. (Tr. at 23). The ALJ reached a similar determination with respect to the March 2008 opinion of Dr. Stephen Burge. (*Id.*). Like Dr. Puestow, Dr. Burge opined that Claimant could occasionally lift and carry fifty pounds, frequently lift and carry twenty-five pounds, and could sit, walk, and stand six hours each in an eight-hour workday, with unlimited ability to push and pull. (Tr. at 584).

The fifth opinion addressed by the ALJ was prepared by Dr. Kip Beard in May 2010. (Tr. at 23-24, 670). Dr. Beard felt that Claimant could lift twenty pounds frequently, and up to 100 pounds occasionally. He opined that Claimant could stand and/or walk a total of four hours in an eight-hour workday and could sit four hours.

Claimant could frequently push and pull. (Tr. at 672). Although, Dr. Beard's limitations on standing and walking were less than the six hours set forth in SSR 83-10, Claimant's RFC would still properly be expressed in terms of light level exertional work. SSR 96-8p, 1996 WL 374184, at *3 ("At step 5 of the sequential evaluation process, RFC **must** be expressed in terms of, or related to, the exertional categories when the adjudicator determines whether there is other work the individual can do.") (emphasis added). Because the analysis subtly shifts from an assessment of the claimant's functional limitations and capabilities to the identification of the claimant's potential occupational base, matching the appropriate exertional level to the claimant's RFC is the starting point. As the RFC is intended to reflect the **most** the claimant can do, rather than the least, the ALJ expresses the RFC in terms of the highest level of exertional work that the claimant is generally capable of performing, but which is "insufficient to allow substantial performance of work at greater exertional levels." SSR 83-10, 1983 WL 31251, at *2; *see also* SSR 96-8p, 1996 WL 374184, at *2 (recognizing RFC represents most that individual can do given limitations). From there, the ALJ must determine whether the claimant's RFC permits him to perform the full range of work contemplated by the relevant exertional level, or a reduced range. SSR 83-10, 1983 WL 31251, at *5. "[I]n order for an individual to do a full range of work at a given exertional level the individual must be able to perform substantially all of the exertional and nonexertional functions required in work at that level." SSR 96-8p, 1996 WL 374184, at *3. If the claimant's combined exertional and nonexertional impairments allow him to perform some of the occupations classified at a particular exertional level, but not all of them, the occupational base at that exertional level will be reduced to the extent that the claimant's restrictions and limitations prevent him from doing the full range of work

contemplated by the exertional level. *See* SSR 83-14, 1983 WL 31254, at *6. However, the exertional level expressed in the RFC finding does not change. Instead, a vocational expert is generally consulted to determine what occupations within the reduced occupational base of the exertional level are still available to the claimant. In this case, the ALJ was not required to incorporate Dr. Beard's standing and walking limitations in the RFC finding, because Claimant underwent surgical repair of his lumbar spine before his RFC was assessed, and the surgery effectively eliminated the symptoms that gave rise to Dr. Beard's limitations.

In July 2011, Dr. Stephen Nutter examined Claimant and prepared a medical source statement that was considered by the ALJ. (Tr. at 24). Dr. Nutter opined that Claimant could frequently lift and carry twenty pounds and could occasionally lift and carry up to fifty pounds. (Tr. at 692). He believed Claimant could stand four hours in and eight-hour work day, could walk three hours, and could sit five hours. (Tr. at 693). He indicated that Claimant had unlimited ability to push and pull and could continuously operate foot controls. (Tr. at 694). The ALJ gave the opinion some weight, again indicating that while the opinion was consistent with the then current evidence, Claimant's condition improved after back surgery. (Tr. at 24).

The seventh opinion reviewed by the ALJ was prepared by Dr. Paul Craig in August 2011 at the request of Claimant's counsel. (Tr. at 24). The ALJ did not give any special significance to Dr. Craig's opinion that Claimant was disabled, but gave some weight to his RFC assessment. Dr. Craig opined that Claimant could lift and carry fifteen to twenty pounds occasionally, could not lift and carry anything frequently, could stand and walk up to six hours per day and could sit six hours out of an eight-hour work day. (Tr. at 714-15).

Finally, the ALJ reviewed an opinion prepared by agency consultant Rakesh Wahi, M.D. on March 11, 2013, less than one month before Claimant's back surgery. (Tr. at 24). Dr. Wahi found that Claimant could continuously lift and carry up to twenty pounds, could sit six hours in an eight-hour work day, but could only stand and walk a maximum of two hours. (Tr. at 800-01). He felt Claimant could frequently push, pull, and use foot controls. (Tr. at 802). The ALJ found the opinion consistent with Claimant's condition immediately prior to his back surgery, but gave it only "some" weight in light of Claimant's improvement post-operatively. Consequently, while Dr. Wahi's opinion reflected an increased impairment during the month prior to Claimant's surgical correction, his opinion does not establish that Claimant suffered symptoms meeting this level of intensity and severity for at least twelve continuous months.

In addition to the opinion evidence, the ALJ discussed Claimant's longitudinal medical record. (Tr. at 19-23). He indicated that according to the records, Claimant's 2006 lumbar and knee injuries, which in part formed the basis of his applications, resolved by January 2007, and Claimant received no medical treatment until December 2007 when he was sent to a pain management specialist by Workers' Compensation. (Tr. at 19-20). After that, he received conservative treatment, including medication and physical therapy, and improved. (Tr. at 20). Claimant did not seek or receive additional substantive treatment until April 2012, when he established care with Dr. Grant Parkins at the Roane General Medical Clinic for complaints of back pain secondary to a recent fall in the shower. Essentially, Claimant had reinjured his back and was experiencing a short-term exacerbation of symptoms. However, Claimant was treated conservatively with medication and began to improve. (Tr. at 20-21). Indeed, Claimant obtained employment at Walmart stocking shelves within a few months of the fall.

In October 2012, Claimant again fell; this time, he fell off the back of a pick-up truck, striking his lower back and buttock. (Tr. at 867). He experienced acute worsening of his chronic back pain, which resulted in his assessment by a neurosurgeon, (*id.*), and ultimately his back surgery. (Tr. at 847-52). Within six weeks after the procedure, Claimant reported complete relief from his back and leg pain. (Tr. at 824). Accordingly, a review of the record supports the ALJ's interpretation of Claimant's condition; that being, that the exertional restrictions caused by Claimant's back and leg pain remained relatively constant during the period at issue, with the exception of a few short-term exacerbations of symptoms that culminated in surgery. By May 2013, Claimant's underlying back problems had been definitely addressed, and the symptoms resolved. Thus, there was no continuous twelve-month period when Claimant's maximum capacity to perform work-related functions fell below the level of light exertional work. *See Rosales v. Colvin,* No. CV–12–1550–PHX–GMS, 2013 WL 1410387, at *4 (D. Ariz. Apr. 8, 2013) (holding that in order to be entitled to consideration for a closed period of disability, the claimant must show that he was disabled "for a period of **not less** than twelve months.").

Nonetheless, Claimant is correct that the ALJ could have been more explicit in his written decision with respect to a "closed period" of disability, if for no other reason than to make it clear that he considered Claimant's applications in that context. Still, the ALJ found that Claimant was not disabled at any time from his alleged disability onset date through the date of the ALJ's decision. "Implicit in this finding is the fact that [Claimant] was not entitled to a closed period of disability at any relevant time." *Atwood v. Astrue,* Civil No. 5:11CV002–RLV–DSC, 2011 WL 7938408, at *6 (W.D.N.C. Sept. 28, 2011). Assuming for argument's sake that the ALJ's failure to expressly raise and reject a

closed period of disability was erroneous, then the Court finds it to be harmless error.

Courts have routinely applied a harmless error analysis to administrative decisions that do not fully comport with the procedural requirements of the agency's regulations, but for which remand "would be merely a waste of time and money." *See, e.g., Jenkins v. Astrue,* 2009 WL 1010870 at *4 (D.Kan. Apr. 14, 2009) (citing *Kerner v. Celebrezze,* 340 F.2d 736, 740 (2d Cir. 1965)). The Fourth Circuit has employed a similar analysis in the context of Social Security disability determinations. *See Morgan v. Barnhart,* 142 F.App'x 716, 722–23 (4th Cir. 2005) (unpublished); *Bishop v. Barnhart,* 78 F.App'x 265, 268 (4th Cir. 2003) (unpublished). In general, remand of a procedurally deficient decision is not necessary "absent a showing that the [complainant] has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Connor v. United States Civil Service Commission,* 721 F.2d 1054, 1056 (6th Cir. 1983); *Burch v. Astrue,* 2011 WL 4025450, at *6 (W.D.N.C July 5, 2011) (*citing Camp v. Massanari,* 22 F.App'x 311 (4th Cir. 2001)) (holding that a claimant must show that, absent error, the decision might have been different). An ALJ's error is harmless when it does not substantively prejudice the claimant. *See Mascio v. Colvin,* 780 F.3d 632, 639 (4th Cir. 2015) (finding that an ALJ's error in assessing a claimant's credibility after, instead of before, determining his RFC was be harmless so long as the ALJ conducted a proper credibility assessment); *Tanner v. Comm'r of Soc. Sec.,* No. 14–1272, 602 F.Appx. 95, 101 (4th Cir. 2015) (finding an ALJ's error to be harmless where it was "highly unlikely, given the medical evidence of record, that a remand to the agency would change the Commissioner's finding of nondisability"); *Austin v. Astrue,* No. 7:06–CV–00622, 2007 WL 3070601, *6 (W.D.Va. Oct. 18, 2007) ("[E]rrors are harmless in social security cases when it is inconceivable

that a different administrative conclusion would have been reached absent the error")
(citing *Camp,* 22 F. App'x at 311).

In order for a reviewing court to find an error harmless, the court must be able to plainly see from the ALJ's written decision that the prejudicial effect of the ALJ's mistake was, in some way, remedied, so that the final determination of nondisability is in truth supported by substantial evidence. Here, the ALJ thoroughly examined, considered, and discussed the status of Claimant's physical and mental impairments over the more than seven years between the alleged onset of disability and the written decision. The ALJ also fully analyzed the medical source opinions, as well as Claimant's activities, statements, and testimony over that period of time. The ALJ's final determination that Claimant's RFC fell within the light exertional level, with nonexertional limitations, was well-reasoned and substantially supported by the record.[3]

Consequently, remanding the case for the purpose of having the ALJ confirm the absence of a closed period of disability, without any reasonable likelihood of a different outcome, would be a waste of time and resources. Thus, the Court finds that the ALJ's RFC finding is supported by substantial evidence, and any error that occurred in the analytical process or in writing the decision, caused no prejudice to Claimant and therefore was harmless.

---

[3] Claimant also criticizes the ALJ's failure to more fully account for his marked limitation in the ability to respond to usual work situations and adapt to changes in the work environment. The ALJ specifically mentioned this limitation in his RFC discussion and accounted for it by restricting Claimant to jobs "in a stable work environment with few if any changes." (Tr. at 18, 26). Claimant provides no rationale for his contention that the restriction in the RFC, as written, is insufficient to address the marked limitation. Contrary to Claimant's position, the Court finds the above-stated language, which was included in the ALJ's hypothetical questions to the vocational expert, adequately accounts for Claimant's marked limitation in that single element of social functioning.

## VIII.  Conclusion

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  August 7, 2015

Cheryl A. Eifert
United States Magistrate Judge